PARK & TILFORD IMPORT CORPORATION *v.*
RICHARD NASH ET AL.

[No. 123, October Term, 1933.]

*Decided March 2nd, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Addison E. Mullikin* and *Theodore C. Waters,* with whom were *Henry I. Fillman, Jenifer & Jenifer,* and *Mullikin, Sherwood, Stockbridge & Waters,* on the brief, for the appellant.

*Clarence W. Miles,* with whom were *T. Baxter Milne* and *Miles & O'Brien* on the brief, for Richard Nash and others, appellees.

*Walter C. Mylander,* with whom was *John L. Sanford* on the brief, for John L. Sanford, Jr., and others, appellees.

PATTISON, J., delivered the opinion of the Court.

Mrs. Catherine C. Lanahan, of Baltimore County, Maryland, died on February 13th, 1920, leaving a will which contained the provision: "I hereby constitute and appoint N. Charles Burke to be the sole executor of this Will; but in case of his death, resignation, disqualification for any reason, or his refusal to act as such executor, then I appoint hereby the Safe Deposit and Trust Company of Baltimore to succeed him and to be the executor of this my Will." The will was admitted to probate and letters testamentary were duly granted to N. Charles Burke, the executor therein named, and he proceeded with the administration of the estate. On December 8th, 1923, N. Charles Burke died, after having fully administered all of the assets of the estate which had been inventoried by him as such executor, and which included all assets of the estate known at that time to have any value.

William Lanahan, the husband of Catherine C. Lanahan, was in his lifetime engaged in the liquor business in the City of Baltimore under the trade-name of William Lanahan & Son, and in connection therewith he used a certain trade-mark known as "Hunter Rye," and this asset, and other property belonging unto him, passed, under the resid-

uary clause of his will, to his widow, Catherine C. Lanahan; but, as the Eighteenth Amendment to the Federal Constitution had been passed at the time of the death of the latter, and the sale of whisky prohibited, this trade-mark was not supposed to be of any value. Since which time, however, the constitutional amendment has been repealed and the sale of whisky is now lawful; in consequence of which the trademark now has a value, and, because of such fact, the Safe Deposit & Trust Company, on July 18th, 1933, applied to, and obtained from, the Orphans' Court of Baltimore County letters of administration, *d. b. n., c. t. a.,* on the estate of Catherine C. Lanahan, deceased, that it might administer upon this asset of her estate which hitherto had not been administered upon.

An inventory of the estate, consisting of the "trade-mark and good will of the business conducted by the said Catherine C. Lanahan, in the City of Baltimore under the trade-name of William Lanahan and Son," was made on August 16th, 1933, and returned on the 18th day of August, 1933, in which inventory the value of the trade-mark, etc., was placed at $15,000.

On the 22nd day of August, 1933, the court, upon the petition of the administrator, passed an order authorizing it "to sell for cash, 'all the right, title, interest and estate, legal and equitable of the said Catherine C. Lanahan, at the time of her death in and to the trade-mark and good will of the business conducted by the said Catherine C. Lanahan in the City of Baltimore, under the trade-name of William Lanahan and Son,' at private sale for not less than the appraised value thereof." On the same day, August 22nd, 1933, the administrator filed its account of sales, in which it is said "that pursuant to order of this Honorable Court it has sold * * * to the Park and Tilford Import Corporation (the appellant), at private sale for the sum of $15,000 cash, the appraised value thereof," the property specifically described in the aforesaid order authorizing its sale, although it appears from the following receipt, found in the record, that

the Safe Deposit & Trust Company, administrator, previous to August 10th, 1933, and previous to the date of the inventory and appraisement and the order directing the sale of the property, had sold this trade-mark and good will attached to the business unto the appellant. On the same day, at the time of filing the account of sales, upon the application of Seymour O'Brien, solicitor for certain of the heirs at law and appellees in this case, the court passed a *nisi* order upon the sale then made, by which it was to be ratified and approved "unless cause to the contrary be shown on or before September 5th, 1933."

On the 30th day of August, 1933, upon the application of the purchaser, the court passed a further order rescinding its *nisi* order of August 22nd, and ordering "that the sale reported be, and the same is hereby ratified and confirmed and the Administrator is hereby authorized and directed to execute such assignment as may be necessary to fully vest in the purchaser the title to the property sold."

On the same day as the passage of the last preceding order of August 30th, 1933, a petiton was filed by the appellees, through their counsel, alleging that they had received an offer of $25,000 in cash for the purchase of the property in question, and further alleging that the *nisi* order of July 22nd was rescinded by the court without notice either to them or their counsel, and asked that the court rescind its order of August 30th, 1933, "and revive and re-enter its aforementioned order of August 22nd, 1933, ratifying and approving the account of sale filed herein on or about August 22nd, 1933, unless cause to the contrary be shown on or before September 5th, 1933." Upon this petition, the court, on August 31st, passed an order vacating and revoking its said order of August 30th, 1933, and further ordered that the account of sales aforesaid "be ratified and approved unless cause to the contrary be shown on or before September 5th, 1933." Thereafter, and within the time allowed them by the *nisi* order, the three groups of appellees each filed exceptions to the ratification of the sale, among the grounds therefor being:

"1st: That the selling price of Fifteen Thousand Dollars ($15,000) is grossly inadequate and does not represent the fair value of the property purported to be sold.

"2nd: That exceptants are confident that they can obtain an offer in excess of Fifteen Thousand Dollars ($15,000) for the property purported to be sold.

"3rd: That since the filing of the report of the said sale by Safe Deposit and Trust Company of Baltimore, exceptants, through their counsel, obtained an offer from a purchaser whom they believe to be reliable at a figure greatly in excess of Fifteen Thousand Dollars ($15,000) and that owing to some delay in having the said offer accepted by said Safe Deposit and Trust Company, the said offer has been withdrawn; that exceptants feel that under all the circumstances, they are entitled to a reasonable opportunity to endeavor to have the said offer revived inasmuch as the delay in its acceptance was not due in any manner to their actions or omissions but was entirely beyond control of the exceptants.

"4: That offers have already been received in the short time elapsed since filing the said report of sale, greatly in excess of the proposed sale price.

"5: That no effort was made by the Administrator *d. b. n., c. t. a.* reporting said sale to test out the market, nor to ascertain by and through expert advice the real value of the assets by said sales report sought to be sold.

"6: That the sale so reported was collusively made, as appears from the hasty and illegal manner in which the whole proceedings herein have been conducted.

"7: That the appraisers * * * appointed to appraise said assets never had any expert knowledge on the subject matter of the appraisement, nor did they seek such expert advice as would qualify them in making the appraisement herein, nor did they fully understand or know the constituent elements of the good will * * * appraised by them."

A petition was filed by each of the three groups of the appellees, respectively, on September 5th, September 13th, and September 19th, alleging, among other things, that letters

were granted to the Safe Deposit & Trust Company without obtaining renunciation from the petitioners and without giving to them any notice; that application had been made to the court by the Safe Deposit and Trust Company for the issuance to them of letters of administration, and each asking for the revocation of the letters of administration on the estate of Catherine C. Lanahan, deceased, issued to the Safe Deposit and Trust Company. The last of these petitions asked that, upon the revocation of said letters issued to Safe Deposit and Trust Company, letters of administration be granted to the petitioner Gertrude C. Harris. Upon this last petition, an order was passed on September 19th rescinding the order of July 18th, granting letters of administration, *d. b. n., c. t. a.,* on the estate of Catherine C. Lanahan, deceased, to the Safe Deposit and Trust Company of Baltimore. From this order no appeal was taken. The record then discloses that the court agreed to appoint, as administrator of the said estate, Richard Nash, a son of a deceased sister of Mrs. Lanahan; but it is not shown by the record that any order was passed to that effect and the case proceeded, so far as the record discloses, without any appointment being made. Thereafter, evidence was heard upon the exceptions to the ratification of the sale made by the Safe Deposit and Trust Company to the appellant.

William Y. Goldsborough, of the firm of Reckords & Goldsborough, which had been in the wholesale whisky business since 1885, testified that he was familiar with the business of William Lanahan & Son, and with the copyrighted trademark "Hunter Rye," used by that company. The company "had a wonderful trade-mark and did a wonderful business," and "was known all over the world"; that his firm, Reckords & Goldsborough, did the "second or third largest" business in the city of Baltimore, but he did "not feel that Lanahan had a lot of competition." When asked to give his opinion as to the value of the "Hunter Rye" trade-mark, he answered: "Well, personally, I think a dollar a case. * * * The Lanahans at one time, to my knowledge, were shipping 2,000 cases a day. Of course, that was built up by an awful lot of ad-

vertising. But under any conditions I feel that after prohibition is repealed, and things get straightened out, you would ship at least a hundred cases a day under any conditions." Hence, its value on a royalty basis would be so much as one hundred dollars a day or $30,000 a year, counting three hundred working days in a year. He was then asked, "What have you got to say as to the fairness" of an offer of $15,000 for the good will of William Lanahan & Son, including all their copyrights and trade-marks? His reply was: "Well, I do not personally think there is anything fair about it. I think ti is a ridiculous offer." And when asked, "How much do you think it is worth?" his reply was, "I would say it was worth a quarter of a million dollars under any conditions."

On cross-examination, he was asked: "You speak of a royalty basis of a dollar a case that you would be willing to give for it. Would you be willing to give any guarantee of a minimum number of cases that you would use or the minimum amount you would pay per annum?" Answer: "That would be an impossibility, due to the fact that in the fourteen years a long time has passed, and a good many old whiskey drinkers have died, and a good many young ones will come up who are not familiar with brands, but I still say the brand has a wonderful prestige to it. There is still millions of people living that know that brand." Witness stated that he knew that the registration, in Washington, of "Hunter Rye" trade-mark had expired. This he learned when there looking after the re-registration of some of the trade-marks of his own firm, and he also learned that dealers were applying for the registration of the trade-marks of others which had expired. This, however, he thought would amount to nothing, inasmuch as, in his opinion, the one originally registering the trade-mark would succeed in the re-registration of it, and that his estimate of the value of the "Hunter Rye" trade-mark was made with this knowledge.

George J. Goldsborough, a brother of the preceding witness, testified that he, too, was associated for a short time with his father in the whisky business under the name of

Reckords & Goldsborough, in pre-prohibition days. He was in the whisky business three or four years only, but he knew of the "Hunter Rye" trade-mark, which, as he said, was "known all over the world," and it was his opinion that it was "the only whiskey from this country that was shipped abroad." He, like his brother, thought that the offer of $15,000 for the "Hunter Rye" trade-mark was "positively ridiculous."

Seymour O'Brien, counsel for Mrs. Gertrude Harris, who was a sister of Mrs. Lanahan, and for Mr. Nash, who is the son of a deceased sister of Mrs. Lanahan, and, with Mr. Milne, counsel for others of the appellees, testified that, since the revocation of the letters of administration granted to the Safe Deposit and Trust Company, he had received an offer for the "Hunter Rye" trade-mark and the good will of the business of William Lanahan & Son. He was asked: "Will you state the amount of the offer?" His answer thereto was: "In the first place, prior to the revocation of the letters granted to the Safe Deposit and Trust Company," he and his partner, Mr. Miles, "had been negotiating with several prospective purchasers," and "we received one cash offer which was considerably in excess of the offer of Park and Tilford Import Corporation (appellant); and since the revocation of the letters we have received another offer which is better than the first and very substantially greater than the offer of Park and Tilford Import Corporation. Q. Will you state the amount of the offers? A. The first offer was $20,000 cash; the second offer was $15,000 cash, and $35,000 additional over a period of three years. Q. That is the offer you now have? A. I may state to the court that the matter is still in negotiation and that counsel is meeting in our office next week for further discussion of the matter. As these offers have not been accepted nor have the heirs whom I represent indicated that they would favor such a sale, the matter is in process of negotiation. But those offers have been forthcoming up to the present time and from responsible purchasers. Q. Of course, Mr. O'Brien, the new admin-

istrator, not having yet qualified, is not in a position to defi-nitely consummate any sale. A. That is correct. Our posi-tion in the matter has been that we represent the beneficiaries, and that we are seeking offers for the property to be sold, such offers, when ultimately arrived at, to be submitted to the proper representative of the estate, and such offer, if acceptable to our clients, to then be recommended to the court by our clients."

On cross-examination, he testified that the offer of $20,000 was received at or about the time they filed their exceptions, September 5th. No money accompanied the offer. When asked what conditions were attached to the verbal offer of $20,000, as to delivery of the trade-mark, he answered: "It had been submitted to the prospective purchaser that they purchase all right, title and interest of the estate in and to this trade-mark, good will, without the use of the name 'Lanahan' and it had also been stated that the Sherwood Distilling Company had filed an application for registration of the trade-mark and it had been opposed. We gave a full disclosure of all the facts, in so far as we knew, and only asked them to bid on the right, title and interest of the estate of Catherine C. Lanahan in and to the trade-mark. Q. It was contingent on the delivery of this trade-mark, free of all claims? A. No, it is not. You deliberately mis-construe my language. I say it was the right, title and interest of the estate."

Neither of these offers was in writing.

There was put in evidence, through the witness Mr. Milne, one of the counsel for the appellees, a contract, made on the 14th day of August, 1933, by and between Park & Tilford Import Corporation and one C. R. Hill, acting for and on behalf of Hunter Baltimore Rye, Incorporated, at the time in process of organization, wherein the Park & Tilford Im-port Corporation recited the sale to it from the Safe Deposit and Trust Company of Baltimore, administrator, of the "Hunter Rye" trade-mark and good will connected there-with, by which the Park & Tilford Import Corporation sold

said trade-mark and good will to C. R. Hill on the following terms:

"(a) Thirty-five thousand ($35,000) Dollars in cash, Ten Thousand ($10,000) Dollars to be paid upon the signing of this contract, the balance of Twenty-five Thousand ($25,000) Dollars within one hundred and twenty (120) days from the date of the application to the Federal Securities Commission;

"(b) Seventy Thousand (70,000) shares of the said capital stock of the said New Corporation, to be known as Hunter Baltimore Rye, Inc., to be delivered to Seller simultaneously with the said payment of Twenty-five thousand ($25,000) Dollars; and

"(c) A continuing royalty of three and three-quarter (3¾c.) cents on each Hunter Rye Label used by the New Corporation in its business of manufacturing, selling and/or distributing Hunter Rye Whisky, or by any successor seller, manufacturer or distributor thereof."

Lancelot Stevenson, a witness produced by the appellant, at one time engaged in the liquor business, but now retired, testified that he had been connected with H. V. Kirk & Company, a copartnership up to 1899, afterwards a corporation, in New Jersey and New York, in the marketing of "Old Crow Rye Whiskey." When asked if he were able to place an estimate of the value on the trade-mark of "Hunter Rye" whisky, he stated, "I would say that the commercial value —I am not speaking of the speculative value—of 'Hunter Rye' trade-mark today is practically negligible," and gave as his reasons the following: That "just about the time that prohibition took effect, the Lanahan interests announced that they were going to close up their business. They did discontinue business and since that time the trade-mark has been practically dead. When you consider that the trade-mark has not been used for a period of fifteen years, its value is practically destroyed, that is, from a commercial point of view; I am not speaking of the speculative value. Speculative value I would call whatever you could get for it. From

my experience in the whiskey business, I would say I would not give much for it, that is, for commercial use, under-stand." He was then asked: "If you were in the market for a trade-mark, and wanted to go in the whiskey business, what would you be willing to give for 'Hunter Rye' trade-mark? A. Without the name of Lanahan I would not care to pur-chase it. Q. What is the outside figure under the most favorable circumstances you would be willing to give for it? A. I might consider $5,000."

This concluded the evidence produced as to the value of the trade-mark and good will mentioned.

Edward H. Burke and Henry I. Fillman were also put on the stand by the appellant, but neither of them attempted to place any value upon the assets in question.

Howard H. M. Lee, vice-president of the Safe Deposit and Trust Company, testified that negotiations for the sale of the "Hunter Rye" trade-mark and the good will of William M. Lanahan & Son to Park & Tilford were with Harbeck, Dobson and Pell. The negotiations opened by letter from Mr. Pell in the early part of July, 1933. After some cor-respondence, Mr. Harbeck "came down to our office on July 13th." After a brief discussion he said, "We will offer you $15,000 cash for the trade-mark." The witness replied, "We want to get all we can for it." No further reply was made to Harbeck's offer, "but we then communicated with five other persons who had been discussing the trade-mark with us, we wrote them a letter to submit an offer in writ-ing by July 18th of this year, not later than three o'clock in the afternoon of that day." All these parties resided in the City of Baltimore. He received no answer to any of these invitations, and on that afternoon, after the time had elapsed, "we wrote to the firm of Harbeck, Dobson & Pell that we accepted their offer, * * * and told them all we had to sell them was the right, title and interest in and to the trade-mark and good will, without the use of the name of William Lanahan and Son, and we would assign that to them or their nominee." They were told "they would have to

elect by August 21st, 1933, whether that title was satisfactory to them and to pay the purchase money on or before that date."

On August 10th, the Safe Deposit and Trust Company received of Park & Tilford Import Corporation, the appellant herein, their check, dated August 9th, for the sum of $15,000, in payment of the purchase price for said trademark and good will. The parties to whom witness wrote, asking to submit an offer for the purchase of the property, were "Weilepp and Bruton * * * bankers and brokers of Baltimore, C. E. Dulaney, J. Y. Bonsall, Henry L. Duer, Hugh L. Watts, real estate officer with the Mercantile Trust Company."

William Y. Goldsborough had testified that he, in March, called at the office of the Safe Deposit and Trust Company in relation to the purchase of the trade-mark and good will connected therewith, and was told by the company that no application had been received for the purchase of it, that "they had not gone into the matter and that they would go into it later, that there had not been any disposition made of the brand, and that my name would be first on the list and that when they did make any disposition of it, I would be consulted and given an opportunity on it." The trade-mark was thereafter sold without any notice to him whatever, and no opportunity was afforded him to become a purchaser of it. Mr. Lee, when asked about the visit of Mr. Goldsborough to his office, said that Mr. Goldsborough was in his office, as stated by him, in relation to the purchase of the trade-mark, but said that they had "no such notation that we would put him first on the list"; that it was "an omission on our part not taking it up with Mr. Goldsborough."

The orphans' court, upon the evidence produced, sustained the exceptions to the sale of the trade-mark and good will made by the Safe Deposit and Trust Company, administrator, to Park & Tilford, and it is from the three orders, passed upon the exceptions filed by the three groups of exceptants, that the appeal was taken.

After a full consideration of the evidence produced as to

the value of "Hunter Rye" trade-mark and the good will connected therewith, we cannot escape the conclusion that the amount of $15,000, named as the consideration in the sale of it by the Safe Deposit and Trust Company, administrator, to the Park & Tilford Import Corporation, was inadequate.

Mere inadequacy of price, however, standing alone, is not sufficient to vacate a sale, unless it be so gross and inordinate as to indicate some mistake or unfairness in the sale, for which the purchaser is responsible, or misconduct or fraud on the part of the trustee making the sale. *Glenn v. Clapp,* 11 G. & J. 1; *Cohen v. Wagner,* 6 Gill, 236; *Johnson v. Dorsey,* 7 Gill, 269; *Gibbs v. Cunningham,* 1 Md. Ch. 44; *Hintze v. Stingel,* 1 Md. Ch. 284; *House v. Walker,* 4 Md. Ch. 63; *Hubbard v. Jarrell,* 23 Md. 66; *Warfield v. Ross,* 38 Md. 85; *Horsey v. Hough,* 38 Md. 137; *Gould v. Chappell,* 42 Md. 467; *Bank of Commerce v. Lanahan, Trustee,* 45 Md. 396; *Mahoney v. Mackubin, Trustee,* 52 Md. 357; *Loeber v. Eckes,* 55 Md. 1; *Dircks v. Logsdon,* 59 Md. 173; *Chilton v. Brooks,* 69 Md. 584, 16 A. 273; *Condon v. Maynard,* 71 Md. 601, 18 A. 957; *Garritee v. Popplein,* 73 Md. 322, 20 A. 1070; *Shaw v. Smith,* 107 Md. 523, 69 A. 116; *Hunter v. Highland Land Co.,* 123 Md. 644, 91 A. 697; *Boyd v. Smith,* 127 Md. 359, 96 A. 526; *Long v. Worden,* 148 Md. 115, 128 A. 745.

As we said, speaking through Judge Offutt, in *Long v. Worden,* 148 Md. 115, 128 A. 745, 748, while "mere inadequacy of price is not sufficient to justify the court in setting aside a sale, unless it be so gross as to itself afford evidence of negligence or bad faith; yet it may be considered by the court in estimating the effect of any error, default, or derelictino of an assignee or trustee in selling property."

In the sale of the trade-mark and good will, it was the duty of the administrator to exercise the same degree of judgment and prudence as an owner would have done in the sale of his own property. If the administrator was without knowledge of the value of the trade-mark and good will, it should have made proper effort to have learned its value, and the greater the difficulty of learning its value, the greater was the effort

required of the administrator. There can be no assurance of a sale being fair and just to the owners, unless the seller has some adequate knowledge of the value of the property which he is to sell. *Robertson Mfg. Co. v. Chambers,* 113 Md. 232, 77 A. 287; *Hubbard v. Jarrell,* 23 Md. 83; *Hopper v. Hopper,* 79 Md. 402, 29 A. 611; *Carroll v. Hutton,* 88 Md. 676, 41 A. 1081. In this case we do not think the evidence discloses that the administrator made the proper effort to ascertain the value of the property and to bring it properly into the market, as a result of which it did not obtain therefor a fair and adequate price.

The order of the orphans' court, upon which the sale is purported to have been made, was passed on August 22nd, 1933. By this order the property was to have been sold at private sale for not less than the appraised value thereof. The appraisement was made on August 16th, and returned on August 18th, while the actual sale was made and the purchase price therefor paid so early as the 10th of August, at a time when, not only the appraisement had not been made by which the administrator was to be controlled in the sale, in that the property was not to be sold for less than the appraised value, but also before the passage of an order authorizing the sale of the property. It is true that, when the property was appraised, its value was placed at $15,000 by appraisers appointed by the orphans' court, and this was the amount at which the property was sold. Just how that happened is not disclosed by the record, but in no event could the administrator, in the sale made on or before August 10th, have been aided or helped in any way in determining the value of the property by this appraisement subsequently made, and it is not shown by the record that any attempt was made to ascertain whether the price at which this property was sold was an adequate price, except so far as Mr. Lee wrote the letters to the persons mentioned, inviting them to make a bid, which they did not see fit to do. These persons may or may not have been interested in purchasing the trade-mark. They were to be heard from not later than three o'clock on July 18th, and as they were not heard from at that time, the offer of Park

& Tilford was thereafter, on that day, accepted; and, on the same day, letters testamentary were applied for and issued to the Safe Deposit and Trust Company—whether before or after said acceptance and sale is not shown. The property to be sold was of considerable value, though its real value was difficult of ascertainment because of its character. The fact that it was to be sold at private sale, and not at public sale, in which latter case the sale would have been advertised, did not prevent it from being advertised to be sold at private sale, where notice would have been given to the public, including those interested in its purchase, that it was for sale, giving them an opportunity to purchase, and thereby bringing it more properly into the market.

It may also be said that, as this property was ordered to be and was sold at private sale, the administrator was subjected to a higher degree of care and attention in relation to the duties imposed upon him than he would have been had the property been sold at public sale. *Weinstein v. Boyd,* 136 Md. 228, 110 A. 506; *Shirk v. Soper,* 144 Md. 269, 124 A. 911.

The orders appealed from will be affirmed.

> *Orders affirmed. Case remanded. The appellant to pay the costs.*