KNIGHT ET AL. *v.* NOTTINGHAM FARMS, INC.

[No. 123, October Term, 1954.]

*Decided April 18, 1955.*

The cause was argued before BRUNE, C. J., DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Lawrence E. Ensor* and *William S. Townsend,* for appellants.

*Kenneth C. Proctor,* with whom was *Milton ʿR. Smith,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from an order ratifying the sale of real estate made by executors. The case comes to this Court on a stipulation of facts, which follows.

William G. Knight, deceased, late of Baltimore County, died on June 6, 1953. He left a will which was duly admitted to probate on June 16, 1953. Letters Testa-

mentary were on that day granted to Walter R. Haile and Roland Knight, the son of the testator, executors named in the will, who so qualified. Under the residuary clause of the will, the executors were directed and empowered to sell the deceased's real estate within two years after his death. The clause directing the sale was as follows: "I hereby vest in my said executors, without application to or authorization by any court, full power and authority to sell, convey, transfer or assign any real or personal property which may constitute the residue of my estate, for the purpose of converting the same into cash, and any purchaser or purchasers from them shall be relieved of the necessity of seeing to the application of the purchase money."

Included in such real estate was a tract of unimproved land, low and marshy, situated along the Great Gunpowder Falls to the east of Pulaski Highway. Although the boundaries of the tract are set forth in a deed to the deceased, no mention of the acreage is made therein and the exact acreage is not known and cannot be ascertained from the Land Records. It is believed, however, to contain upwards of two hundred acres. On August 25, 1953, the executors filed an inventory of the real estate. The above mentioned tract, together with some acreage on the opposite side of the River, was appraised at $2,500.00. The executors checked the Baltimore County tax records and found that the land in question had never been assessed for State and County taxes. It was thereupon assessed for $2,000.00.

During the latter part of June, 1953, Mr. E. H. Nicholson, a real estate broker of the Maryland-Virginia Farm Agency, visited the office of Mr. Elmer R. Haile, the acting counsel for the executors, and inquired whether the Knight property, above referred to, was for sale. He was told that it would be necessary to sell this in order to carry out the provisions of Mr. Knight's will. As neither of the executors were present, there was no discussion as to price or terms of sale and Mr. Nicholson was not authorized to negotiate a sale of this property.

On June 29, 1953, Mr. Nicholson again visited the office of the counsel for the executors and presented to him a contract in triplicate for the sale of the property in question to one Charles Scheeler for the price of $13,-000.00, subject to a real estate commission of five per centum. This contract had been signed by Mr. Scheeler and Mr. Nicholson stated that he had received and was holding a down payment of $1,000.00. The counsel then advised the executors of this offer. After some discussion, they signed the contract subject to the following conditions: first, that the purchaser would accept title regardless of whether there was a valid right-of-way to the property; and, second, that, if any survey was deemed necessary to determine the exact acreage and outlines of the property, the cost of such a survey would be borne by the purchaser. These conditions were inserted in the contract which was delivered to Mr. Nicholson for the purchaser's approval. Mr. Nicholson at that time said he did not think the conditions would be objectionable as the same purchaser had purchased or was negotiating for the purchase of the adjoining property then owned by Richard T. Jones and wife, through which access would be obtained to the Knight property from the Pulaski Highway and as Knight's deed seemed to adequately describe the boundaries of the property. However, a few days later Mr. Nicholson telephoned the counsel and stated that the conditions inserted in the contract by the executors were not acceptable to the purchaser; that the contract had been torn up; that he had returned the down payment to the purchaser; and that the deal was off. During these negotiations Mr. Nicholson did not disclose the fact that Mr. Scheeler was acting as a straw-purchaser for C. J. Langenfelder & Son, Inc. Since then he has admitted that such was a fact. For the purposes of this case it is admitted by the parties that Scheeler was in fact acting for C. J. Langenfelder & Son, Inc.

On August 21, 1953, the executors entered into a contract to sell the property here in dispute to Nottingham

Farms, Inc., appellee here, for the net price of $13,000.00, subject to the same conditions as were inserted in the Scheeler contract, namely, that the purchaser would accept title regardless of whether there was a granted or legally established right-of-way to the property and would bear the expense of any survey. A cash deposit of $1,000.00 was made by the purchaser. This private sale was promptly reported to the Orphans' Court, and the Court passed and caused to be published the usual order nisi, ordering that the sale be ratified and confirmed, unless cause to the contrary be shown on or before September 26, 1953. The negotiations leading to this reported sale were initiated by Leroy W. Kern, agent for the purchaser.

On September 17, 1953, C. J. Langerfelder & Son, Inc., through George H. Langenfelder, president, submitted a signed contract to the executors to purchase the same property for the price of $14,000.00, subject to a broker's commission of five per centum, payable to the Maryland-Virginia Farm Agency. The offer was accompanied by a $1,000.00 check to cover the down payment. This contract was not signed by the executors.

Before the time fixed for ratification of the sale to Nottingham Farms, Inc., exceptions thereto were filed by Jennie B. Knight, widow of the deceased, one of the appellants here, on the ground that $13,000.00 was not the best price that could be obtained for the property, a higher offer having since been submitted by C. J. Langenfelder & Son, Inc.

The execptions were set for hearing by the Orphans' Court on November 10, 1953. No formal sworn testimony was offered at the hearing. However, Nottingham Farms, Inc., was represented by Milton R. Smith and H. Anthony Mueller, its attorneys. The executors and exceptant were represented by Elmer R. Haile, their attorney. Roszel C. Thomsen, of the Baltimore Bar, attended the hearing as attorney for C. J. Langenfelder & Son, Inc. The facts and circumstances relevant to the reported sale were presented by counsel. Mr. Thomsen

first argued that the sale to Nottingham for $13,000.00 should not be ratified, but that Langenfelder's offer of $14,000.00 gross should be accepted. Later, and during the course of the hearing, Mr. Thomsen increased Langenfelder's offer to $15,000.00 net. Still later, and during the course of the hearing, Mr. Thomsen again increased Langenfelder's offer to $18,000.00 net. At the same time, Mr. Thomsen stated to the court that if the sale to Nottingham Farms, Inc., was not ratified, and it was later decided to offer the property by public auction, that his client, C. J. Langenfelder & Son, Inc., would start the bidding off at $18,000.00. Mr. Thomsen presented to the executors a formal contract executed by George H. Langenfelder as president of C. J. Langenfelder & Son, Inc., to purchase the property for the net price of $18,-000.00, accompanied by a down payment check in the amount of $1,000.00. Although not in the stipulations, there is in the record of the case a bond filed by C. J. Langenfelder & Son, Inc., underwriting its offer of $18,000.00.

It is stipulated that the executors entered into the contract of sale to Nottingham Farms, Inc., in the utmost good faith, believing at the time that the price of $13,-000.00 represented the full value of the property. However, the executors did not at any time or in any manner advertise the property for sale, nor did they seek any expert advice as to the value of the property. However, Roland Knight, one of the executors, is the son of the deceased and is, and was at the time of sale, thoroughly familiar with the property. Mr. Walter Haile, the other executor, and Mr. Elmer Haile, counsel for the executors, viewed the property, in company with the Orphans' Court appraisers, prior to the negotiations with Mr. Nicholson.

The case of *Gilden v. Harris*, 197 Md. 32, 78 A. 2d 167, involved the sale of leasehold property in Baltimore. The decree, signed on August 29, 1949, stated that the sale might be made by the trustee appointed by the court either publicly or privately. If a public sale was to be

made, the specified length of time of the advertisement was set out in the decree. As to a private sale, the decree specified that the trustee submit to the court for its approval and ratification any offer or offers received for the purchase of said property at private sale, provided no private sale should be made for a less amount than the "value of said property as shown by the testimony in this case." On March 21, 1950, the trustee reported that the appraised value of the property was $8,250.00 and that she had diligently endeavored to affect a sale. She brought into court a duly executed contract for a private sale at $8,600.00. An order nisi was passed by the chancellor on this report. Higher offers were later made for the property. A petition was filed requesting the chancellor not to ratify the reported sale. A hearing was held on the show cause order passed on that petition. At that hearing the testimony showed that the trustee engaged two realty companies to sell the property, one on February 24, 1950. One realty company placed "For Sale" signs on the property. It was advertised a number of times and shown on numerous occasions. The trustee was also advised by one of the realty companies that the $8,600.00 offer was the highest she could get. The trustee, who was the direct beneficiary of the trust estate during her lifetime, the remainder passing to her two children, stated that she thought she had acted hastily in accepting the $8,600.00 offer and did not want the sale ratified because she had since had higher offers. The chancellor ruled that the $8,600.00 contract was a mere offer until approved by him and that the trustee had acted hastily with inexperience and improvidently. He opened further bids and the trustee was directed to report an offer of $10,100.00. On appeal, this Court was unable to find that the trustee had acted improvidently or hastily. Chief Judge Marbury in that case stated the often repeated principle that the courts should not depart from the policy of encouraging purchasers at judicial sales by sustaining those fairly made in all respects, and for a full price, and by refusing to strip a purchaser of

a right fairly acquired for a full consideration merely because a person, who had had his day for free competition, demands that he be given a second opportunity. He reviewed the decisions of this Court and held the general rule to be "* * * that, if a trustee acting diligently and without fraud accepts an offer at private sale for the most that he is able to obtain for the property *at the time,* and reports that offer to the Court, it will not be set aside merely because someone else is *later* willing to give more for the property."

In the instant case there is no claim of fraud and it is stipulated that the executors entered into the contract of sale in the utmost good faith, believing at the time that the price of $13,000.00 represented the full value of the property. The question, therefore, before this Court is whether the executors here acted diligently and not improvidently. As no public sale was made in this case, it is not necessary that we discuss the requirements for a valid public sale. The case of *Whitely v. Whitely,* 117 Md. 538, 84 A. 68, is not helpful here because the property was offered first at public sale and withdrawn because the bid was deemed inadequate, and was later sold at private sale for a larger amount. In *Boyd v. Smith,* 127 Md. 359, 96 A. 526, the executors and trustees under the will were given authority in the will to make sale of the property "either publicly or privately as they shall decide" when ratified by the court. The executors and trustees obtained an estimate of the value of the property from two property brokers who stated that they were acquainted with the property sold and with its value, and that in their best judgment the amount named in the report of sale of $2,600.00 was its full value and as much as could reasonably be expected to be obtained at public auction. They, therefore, reported the sale at $2,600.00. This Court held that this sale should not be set aside in favor of a later offer of $3,210.00. In *Weinstein v. Boyd,* 136 Md. 227, 110 A. 506, the executor was given power in the will to sell any property of the deceased without aid or intervention of any court. In-

cluded was a leasehold property appraised at $2,200.00. The executor entered into a written agreement on April 9, 1919, to sell the property to Weinstein for $2,400.00 and reported the sale to the Orphans' Court. This sale was ratified on June 16, 1919. He later filed a petition in the Orphans' Court asking that the report of sale be withdrawn, he having received an offer of $2,600.00. A real estate agent testified that the property was worth from $4,000.00 to $5,000.00. The Orphans' Court rescinded its order of ratification. The executor there testified that he had not seen the property for years, that he did not know its value at the time he signed the agreement, that he had no authority to sign as agent for the distributees, that the report of sale was filed at the purchaser's request, that the purchaser agreed to pay an amount in addition to the $2,400.00 for the property, that this additional payment was overlooked at the time the report of sale was filed, and that he did not consult his brothers and sisters. This Court there held that even though the executor had power to sell without an order of court, he had power to ask for approval of the court before selling. After he asked for such authority and the report of sale was filed and the order nisi published, the Orphans' Court had jurisdiction to entertain exceptions to the sale later filed by persons interested in the estate on account of the inadequacy of price. It was said by this Court, in affirming the Orphans' Court, in reference to private sales such as the one there made: "* * * slight inadequacy and reasonable expectation of a better price are sometimes sufficient to justify the setting aside of sales where the approval of a Court is necessary, or where it is invoked; * * *." See also *American Trading & Production Corp. v. Connor*, 109 F. 2d 871, 873, opinion by Judge Soper. In *Shirk v. Soper*, 144 Md. 269, 124 A. 911, trustees were appointed by the court in a partition proceedings to sell real estate and were authorized to make a private sale only upon "due proof and approval by the court, upon such terms as the court shall approve." A private sale was made without

the knowledge or approval of the court. In setting aside the private sale made without knowledge and approval of the court, it was said by this Court that, where a private sale is made, the general rule that mere inadequacy of price in the absence of misconduct, unfairness, mistake, or fraud on the part of the trustee is not sufficient to set the sale aside, is subject to the qualification "that the 'inadequacy' of price necessary to justify such an inference *cannot be separated from the circumstances under which it was offered, * * *.*" (Italics supplied.) In *Kramme v. Mewshaw*, 147 Md. 535, 128 A. 468, the testator in her will created an active trust and gave to the trustees power to sell and dispose of all of her property. The court had not assumed jurisdiction of the trust. The trustees sold an unprofitable truck farm for $25,000.00. They had made every effort to sell it at a larger price. It had been assessed for $17,000.00. The trust was administered without the aid of the chancery court. The sale was attacked on the ground that the property was not advertised for sale publicly, that real estate experts were never consulted in advance of the sale and were given no opportunity to sell it. A bill of complaint was filed by the remaindermen asking that the court assume jurisdiction of the trust, that the sale be set aside, and that the trustees be required to accept a subsequent higher offer for the property. The chancellor held that the court should assume jurisdiction of the trust and that the reported sale should be set aside. This Court there found that there had been the usual "matching of wits" in the effort of the vendors to sell as high, and the vendee to buy as cheap, as possible. In refusing to set aside the sale this Court said: "If a sale should be made by a conventional trustee in good faith and according to his best judgment, the sale will not be set aside unless there exists an inadequacy of price that, under the circumstances, is directly attributable to some failure of reasonable diligence or effort in the making of the sale."

In *Loft, Inc. v. Seymer,* 148 Md. 638, 129 A. 911, the court ratified a lease made by trustees named in a deed of trust. This lease was made privately, subject to the approval of the chancellor. An effort was made to set aside the lease on the single element of price and that the trustees should have auctioned it. This Court held that the private sale was properly ratified because there was no testimony that there was a general market for long term leases, and the bid accepted was the higher of the only two made up to that time. In *Blank v. Frey,* 165 Md. 647, 170 A. 156, the administrator, under an order of the Orphans' Court, sold privately a store property for $6,000.00, it being appraised for the purpose of administration at $5,800.00. An effort was made to set aside the sale because of an offer of $6,700.00 subsequently received. Testimony showed that even before the death of the decedent, efforts to sell the property had been made by her committee, she being an incompetent, and they had failed to receive an offer for as much as $6,000.00. Immediately after the appointment of the administrator, he began to canvass possible purchasers but was unable to find any possibility of sale above the figure of $6,000.00. This Court held that the reported sale should have been ratified. In *Park & Tilford Import Corp. v. Nash,* 166 Md. 373, 171 A. 339, the administrator, d.b.n., c.t.a., was given authority on August 22, 1933, by the Orphans' Court to sell for cash a trade-mark and good will of a business at private sale for not less than the appraised value thereof. On the same day, August 22nd, the administrator filed its report of sale showing that it had made the sale privately for the sum of $15,000.00 cash, the appraised value thereof. On August 30, 1933, the order nisi was rescinded and the sale ratified. On the same day, August 30th, a petition was filed by the appellees, interested parties, that they had received an offer of $25,000.00 for the trade-mark and good will and asked that the order of August 30th be rescinded. This Court pointed out, citing many authorities, that mere inadequacy of price

standing alone was not sufficient to vacate a sale in the absence of mistake, unfairness, misconduct, or fraud on the part of the trustee making the sale. However, in setting aside that private sale, it was said: "In the sale of the trade-mark and good will, it was the duty of the administrator to exercise the same degree of judgment and prudence as an owner would have done in the sale of his own property. If the administrator was without knowledge of the value of the trade-mark and good will, it should have made proper effort to have learned its value, and the greater the difficulty of learning its value, the greater was the effort required of the administrator. There can be no assurance of a sale being fair and just to the owners, unless the seller has some adequate knowledge of the value of the property which he is to sell. *Robertson Mfg. Co. v. Chambers,* 113 Md. 232, 77 A. 287; *Hubbard v. Jarrell,* 23 Md. 83; *Hopper v. Hopper,* 79 Md. 402, 29 A. 611; *Carroll v. Hutton,* 88 Md. 676, 41 A. 1081. In this case we do not think the evidence discloses that the administrator made the proper effort to ascertain the value of the property and to bring it properly into the market, as a result of which it did not obtain therefor a fair and adequate price." In *Cook v. Safe Deposit & Trust Co.,* 172 Md. 398, 191 A. 713, this Court sustained a private sale of real estate made by an executor under the power given in the will. There the executor circularized real estate brokers in and near Baltimore with an offer to sell the property. After considerable negotiations he accepted an offer of $23,000.00, the original offer being $18,000.00. This Court said in that case in sustaining the sale: "Such a 'sale will not be set aside unless there exists an inadequacy of price that, under the circumstances, is directly attributable to some failure of reasonable diligence or effort in the making of the sale.' *Kramme v. Mewshaw,* 147 Md. 535, 548, 128 A. 468, 473. Disappointed bidders, after a sale is closed, do not determine the price at which property will be sold, for the sale frequently, as in this case, enhances the value of property, and adds to its attractiveness."

The appellee here relies strongly on the case of *Kramme v. Mewshaw, supra.* However, in that case the trustees made efforts to sell at a higher price and there "matched wits" with the vendee. There appears to be no substantial efforts to sell or "matching of wits" here. In the instant case, as this was marsh land situated quite a distance from the highway, it is understandable that the executors did not place a "For Sale" sign on it. However, they did not engage any realty companies to sell the property, they did not advertise it or show it to prospective customers, nor were they advised by any realty company that the $13,000.00 offer was the best obtainable, as in *Gilden v. Harris, supra.* The executors did not canvass for possible purchasers as in *Blank v. Frey, supra,* nor did they circularize brokers as in *Cook v. Safe Deposit & Trust Co., supra.* Although not stated in the stipulation, it was a well known fact that the appellee was engaged in the sand and gravel business and this fact must have been known to the executors. When Mr. Nicholson, the real estate broker, made an offer of $13,000.00 for the property which had been appraised, together with another property of the deceased, at $2,500.00 and assessed for $2,000.00, the executors must have become aware of the fact that the property had value other than that of mere marsh land. Mr. Nicholson had stated to the counsel for the executors that the purchaser had purchased, or was negotiating for the purchase of, adjoining property in order to obtain a right-of-way to the property in question here. When Nottingham Farms submitted the net price of $13,000.00, with no commission to be deducted, it seems reasonable that the executors would have again contacted Mr. Nicholson to see whether or not the right-of-way had been purchased and, if so, whether Mr. Scheeler would not pay more than the appellee had offered. There is great disparity here between the contract price of $13,-000.00 and the offer of $18,000.00. We are of opinion that this case is in line with that of *Park & Tilford Import Corp. v. Nash, supra.* From the stipulation before

us the executors did nothing other than remain dormant and receive such offers as might be brought to them. They apparently made no substantial effort to obtain a better offer. They did not obtain expert advice as to the value of the property, as in *Boyd v. Smith, supra.* After Mr. Scheeler's offer, at the latest, the executors should have made an effort to learn its value as stated in *Park & Tilford Import Corp. v. Nash, supra.* Without that knowledge, there was no assurance that any sale of this land, previously regarded before the Scheeler offer as ordinary marsh land, was fair and just to the owners. We are, therefore, of opinion that the order dismissing the exceptions and ratifying and confirming the sale should be reversed.

We see no reason why the executors should have endeavored to obtain a right-of-way to the property before offering it for sale. Any action to do this might have stirred up such litigation as would make the property, which they had for sale, unmarketable. *Gibbs v. Cunningham,* 1 Md. Chancery 44, 47.

*Order reversed and case remanded for
further proceedings, costs to be paid
by the estate of William G. Knight.*

HENDERSON, J., filed the following dissenting opinion.

I cannot escape the conclusion that the facts in the instant case bring it within the rule so clearly restated in *Gilden v. Harris, supra,* (p. 42) that a reported sale is provisional only "for the purpose of saving the beneficiaries of a trust from improvidence, unfairness, or fraud." Subsequent possibilities of obtaining a higher price do not alone furnish sufficient ground for setting aside the sale made.

The opinion is rested on a lack of diligence on the part of the executors, there being no claim of fraud or bad faith. It is admitted that it was not incumbent upon the executors to try to acquire a right of way to the property, to determine its exact acreage, or to post signs

on the property. Yet it is intimated that they should have advertised the property, obtained expert advice as to its value, and have gone back to Mr. Nicholson after receiving the higher bid from the appellee. As I read the record, it would seem that the only persons who might be interested were the contiguous owners, since no one else would have access to the landlocked property, and after Nicholson had stated definitely that the deal was off, and his bid withdrawn, I think the executors were justified in accepting the bid of the appellee. Moreover, the extent of the sand and gravel deposits, which alone gave value to the marshy land, was problematical, and I question whether the executors were under duty to expand the considerable sums necessary for a geological survey. Listing the property with real estate brokers would not accomplish any useful purpose, in the absence of reliable statements as to its intrinsic value for a very special purpose. Certainly there is nothing in the record to show that the price was inadequate, except the fact that Langenfelder belatedly increased his bid. Cf. *Kramme v. Mewshaw, supra.*

The case of *Park & Tilford Import Corp. v. Nash, supra,* so heavily relied on, is distinguishable on its facts. There was testimony that the trade-mark there in question had a tremendous potential value, and the trustee made the sale before the property had even been appraised or the order for sale had been executed, and without notice to another prospective bidder who had asked to be given an opportunity to submit a bid. In almost all of the other cases cited the sales reported were affirmed, despite the subsequent receipt of offers at substantially higher figures. I think there is not a sufficient showing in the instant case that the price was inadequate or that the executors acted improvidently under the circumstances. I think the order should be affirmed.