STANDISH CORPORATION *v.* KEANE ET AL.,
TRUSTEES, ET AL.

[No. 135, September Term, 1958.]

(Two Appeals In One Record)

*Decided May 7, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Blair H. Smith* and *Hal C. B. Clagett,* with whom were *Sasscer, Clagett & Powers* on the brief, for appellant.

*Samuel Intrater,* with whom was *Albert Brick* on the brief, for appellee, Lena E. King.

*George J. O'Hare* and *Ignatius J. Keane,* with whom were *Joseph A. DePaul* and *Keane & DePaul* on the brief, for ap-

pellees, Ignatius J. Keane, George J. O'Hare and Patricia Warren, Trustees, and Lucore, Inc.

HORNEY, J., delivered the opinion of the Court.

When the Circuit Court for Prince George's County vacated its final order of ratification and set aside the sale of a certain parcel of land, which had been made by court-appointed trustees, to the Standish Corporation (Standish or the purchaser), Standish noted its first appeal to this Court, and did not participate in the resale ordered by the chancellor other than to file exceptions thereto in due course. When the chancellor overruled the exceptions Standish had filed and finally ratified the resale of the property to a subsequent bidder, Standish noted its second appeal.

On January 20, 1958, Ignatius J. Keane, George J. O'Hare and Patricia Warren (the trustees) were appointed by the court to sell, in lieu of partition in kind, 7.7717 acres of unimproved land located at the intersection of Riggs Road and University Lane, near Hyattsville. The decree authorized either a public or private sale. All of the trustees were attorneys who had been actively engaged in practice throughout the county for a number of years. All were familiar with the location of the parcel of land to be sold and with the values of real estate in the area. All were aware as well of the increase in such values from time to time brought about by the rapid development of much of Prince George's County as part of the expanding metropolitan area of Washington, D. C. And all, in one capacity or another, as attorney, committee or guardian *ad litem,* represented one or more of the persons owning an interest in the property.

Before and after the trustees had qualified as such they had debated, over a period of several months, and had finally resolved the method of sale, and, in their judgment, had determined that a private sale was likely to be the most advantageous. They were in frequent consultation with real estate brokers in the area. They had had the property appraised by the chief appraiser for the orphans' court, who had valued it at $140,000. They had listed the parcel of land with several brokers in Maryland, Virginia and the District of Co-

lumbia. An open listing of the property had been published in the regular newsletter of the county association of real estate brokers. During the sixty day period between the date of the decree and the sale, the trustees had constantly promoted the sale and supplied full details to all those who, evidencing an interest in the property, had inquired about it. Finally, about twenty days before the day of sale, they had circulated a letter among the real estate brokers, and had posted a copy thereof on the bulletin board of the brokers' association, offering the property for sale on sealed bids to be opened in Washington, D. C., on March 28, 1958, at the law offices of one of the trustees [Patricia Warren] and Albert Brick [attorney for the owner of a one-half interest]. They had not, however, advertised the property in any of the local or Washington newspapers.

On the day of sale [March 28, 1958] three bids had been received—in the sums of $153,500, $176,000 and $177,500. When the bids were opened the highest was that of Standish. The trustees then and there decided to accept the highest bid and report the sale to the court, but in so doing they stated that if and when other substantially higher bids were received, they would also be reported to the court. The trustees received a deposit of $2,500 and entered into the usual formal contract of sale with the purchaser but added a clause to the effect that the terms were "subject to ratification and approval of the * * * [court]."

The trustees did not file their report of sale in the nature of a "petition for authority to accept the offer" until April 23, 1958. In it they stated that the offer was fair, that a sale was to the best interest of all parties concerned and that the offer should be accepted. The report did not suggest to the court that there might be other or higher bids nor was the report sworn to. The order *nisi*—dated April 29—gave notice that the sale of the property would stand for final ratification and confirmation unless cause to the contrary was shown on or before May 17. No exceptions having been filed, the court, after reviewing the proceeding, finally ratified and confirmed the sale to Standish on May 20, 1958, when its attorney presented an order for that purpose. A telegram

from a broker stating he had a client interested in making a higher offer without more was disregarded by the court. Three days later [on May 23] the trustees filed a supplemental report and motion to vacate the final ratification of the sale to Standish. Attached to the motion as exhibits were two contracts. One signed by Hyman Kaplan, dated May 16, offered $202,500 for the property, but was subsequently withdrawn. The other signed by Sven Kjaer, dated May 19, made an offer of $210,000. Neither of the parties who submitted these delayed bids followed through by filing a bid at the subsequent resale.

On June 2, an informal hearing was held by the court in its chambers. In addition to some of the interested parties and their attorneys, two of the trustees were present as was the bidder who had offered $210,000 and another interested bidder—Cafritz. The parties present, who desired to be, were heard but there was no transcript of the proceedings. However, three affidavits made several months after the hearing are in the record. At this hearing, the chancellor, without assigning any reason whatsoever, vacated his final order of ratification and set aside the sale to Standish. The chancellor also authorized and instructed the trustees to return the deposit of $2,500 and ordered and directed the trustees to readvertise the property for sale upon the terms and conditions set forth in the original decree "insofar as they apply to public sales" and were not inconsistent with any order of court. The trustees were further directed to advertise for new sealed bids to be opened by the chancellor in open court on July 1, 1958, at 10:00 a.m. It was from this order that Standish entered its first appeal.

Since no supersedeas bond had been filed by Standish prior to July 1, the sealed bids then on file in response to the advertisement for new bids were opened by the chancellor. Standish did not submit a bid but was present. The highest bid was that of Cafritz at $255,000, which the trustees accepted. They filed their report of resale and petitioned for authority to accept the offer. While the order *nisi* was running on the resale exceptions were filed by Lucore, Inc., the second highest bidder at $220,550. Standish also filed ex-

ceptions. When the exceptions were heard, the chancellor concluded that the Cafritz bid had not been made in accordance with the advertised sealed bid conditions, sustained the exceptions of Lucore, Inc., and overruled those of Standish, and stated he would sign an order ratifying a sale to Lucore, Inc. Subsequently, after a further hearing at the request of Cafritz, the chancellor passed a final order ratifying the sale to Lucore, Inc., at $220,550. From this order and the order overruling its exceptions to the resale, Standish also appealed. Cafritz did not appeal and subsequently accepted a return of his deposit.

(i)

The motion to dismiss the appeal, included in the trustees' brief pursuant to Rule 836 d, cannot prevail. Ordinarily no appeal lies from an order rescinding an order finally ratifying a trustees' sale which has not been enrolled [*Wylie v. Johnston,* 29 Md. 298 (1868)], but when such order also directs a return of the deposit and requires the trustees to proceed to make a resale of the property originally sold by the trustees to the reported purchaser, then the order is in the nature of a final decree from which the original purchaser may appeal. Code (1957), Art. 5, § 6. See *Hunting v. Walter,* 33 Md. 60 (1870), in which an appeal did lie from an order setting aside and annulling the sale. There, it was said at p. 62: "As this case now stands, it is to be considered as if no order of ratification had been passed, the order of the [j]udge below rescinding it, being final and conclusive. The objection of the appellee [the purchaser in that case] to its ratification is, therefore, in time." With respect to the time for transmitting the record to this Court, the chancellor had authority, either upon the application of any party and good cause shown, or upon his own motion, to extend such time. Rule 825 b. On the question of the right to prosecute this appeal, we granted leave to one of the appellees [Lena E. King] to file the affidavit of Albert Brick—to the effect that Standish was no longer the real party in interest and was no longer interested in the outcome of this appeal—as a part of the record herein. However, we are not persuaded that such facts as are set forth in the affidavit in support of the

averments therein contained are sufficient to justify a ruling that the case is moot. Finally, since we have ruled that Standish had standing to appeal from the order of court setting aside the sale to it, it is immaterial whether Standish also had standing to appeal from the order of court overruling its exceptions to the resale and the further order of court finally ratifying that sale. For the reasons assigned the motion to dismiss the appeal is overruled.

(ii)

The principal question raised by this appeal is whether the chancellor erred when he vacated his final order of ratification and set aside the original sale of the property to Standish.

The answer to the question is likely to be found somewhere between the decision in *Gilden v. Harris,* 197 Md. 32, 78 A. 2d 167 (1951), on one hand, and the decisions in *Knight v. Nottingham Farms, Inc.,* 207 Md. 65, 113 A. 2d 382 (1955), and *Webb & Knapp v. Hanover Bank,* 214 Md. 230, 133 A. 2d 450 (1957), on the other hand. In the *Knight* and *Webb & Knapp* cases we held that a sale should not be ratified if the inadequate price reported was attributable to a lack of diligence on the part of the person making the sale or to the failure of such person to make a thorough investigation of local conditions before fixing a price at which the property would be sold. In the *Gilden* case we held that the best obtainable offer accepted and reported by a trustee should be ratified in the absence of fraud, improper dealing or inadequacy of price as of the time the sale was made. But, under the facts and circumstances in the present case, we think the *Knight* and *Webb & Knapp* cases are clearly distinguishable on the facts and that the *Gilden* case is controlling for the reasons hereinafter stated.

In the *Knight* case, *supra,* we reversed the orphans' court which had ratified a private sale made by executors under authority contained in the will of their decedent. There, the unimproved tract of marsh land had been appraised by the orphans' court, but the executors, who had not advertised the property, had not shown it to prospective buyers and had not engaged a broker to sell it, had nevertheless sold it to a broker

as agent for the buyer, and had thereafter received a higher offer before the order *nisi* on the sale had expired. There, it was apparent that the executors, who had not made any substantial effort to ascertain the true value of the property or obtain a better price, had sold the property to the first person who made them an offer on terms agreeable to them. We held that when there is a private sale at an inadequate price, even though there is no claim of fraud or bad faith, the price cannot be separated from the circumstances under which the property was offered for sale if it is evident that the inadequacy of price is directly attributable to a lack of reasonable diligence or effort on the part of the person making the sale to obtain a better offer.

In the *Webb & Knapp* case, *supra,* we affirmed the chancellor who had refused to ratify a private sale made by conventional trustees and submitted by them to a court of equity for its ratification. There, the trustees—after having had the 2000-acre stock farm, which was suitable for development purposes as well as a farm, appraised by local appraisers but only for farm purposes and by an out-of-state appraisal firm which did not consult local real estate brokers—had fixed a sale price and sold the farm to a buyer who had met the fixed price. There, our decision was based in the main on the failure of the trustees to make a thorough investigation of local conditions before they fixed a price at which they would offer the property for sale.

In the *Gilden* case, *supra,* we reversed the chancellor who had properly rejected a higher bid made after the report of sale had been filed, but had improperly received sealed bids from the reported purchaser and the disappointed bidder and ratified a sale to the disappointed bidder whose sealed offer was the higher. There, the court-appointed trustee had had the leasehold property appraised, had engaged brokers to sell it and, after it had been advertised and shown to prospective buyers, had sold it at private sale, but was thereafter offered a higher price before the reported sale was ready for final ratification. There, it was clear that the trustee, who had acted diligently and without fraud, accepted an offer for the highest price she was able to obtain at the time. We ruled

that when a trustee has accepted the best offer he can obtain, and has reported that fact, the court, in the absence of fraud or improper dealing or a clear inadequacy of price *as of the time* the sale was made, should ratify the sale.

In the case now before us the trustees, who were somewhat familiar with the values of real estate in the area and well aware of the potential saleability of the parcel of land in question, had had the property appraised [or, more accurately, under-appraised] and, after consultation with several real estate brokers and a careful consideration of the matter among themselves, had determined that a private sale was the best method of obtaining the highest price for the property. With this in mind they had listed the property with several brokers and had published a listing in the newsletter of the local association of real estate brokers. Finally, they had circularized the brokers in the Washington metropolitan area, and posted a copy of the circular on the bulletin board of the local association, offering the property for sale on sealed bids to be opened on a specified date. Here, the trustees were fully conversant with local conditions. Moreover, other than the omission of advertisements from the local and metropolitan newspapers there is not even a suggestion that the trustees were not diligent in every respect. And, which is more important, there is nothing in the record tending to show the presence of fraud or bad faith or improper dealing on the part of the trustees, the purchaser or any of the parties concerned, nor is there a showing of any inadequacy of price as of the time the sale was made.

In the *Gilden* case, *supra,* in which we restated the applicable law we held that a sale should be treated as provisional only "for the purpose of saving the beneficiaries of a trust from improvidence, unfairness or fraud," and then went on to say on p. 42:

> "The general rule, therefore, is that if a trustee, acting diligently and without fraud, accepts an offer at private sale for the most that he is able to obtain for the property *at the time,* and reports that offer to the court, it will not be set aside merely because

someone else is *later* willing to give more for the property."

Later in the same opinion, we said at p. 44:

"It is the duty of a court of equity to support its trustees in obtaining as many offers as possible, and when the trustee has, in his best judgment, obtained the highest offer he can obtain, * * * the court should, *in the absence of fraud or improper dealing, or clear inadequacy of price as of the time the sale is made, or some valid legal objection,* sustain the trustee and ratify the sale." (Emphasis added.)

To reiterate briefly, it is anomalous, though true, that there is no charge or even a suggestion of any fraud or bad faith on the part of the trustees nor is there any showing of any irregularity, impropriety, improvidence or unfairness or any lack of diligence on their part, or other cause which might be a reason for setting aside the original sale. Thus, although unfortunate as it undoubtedly is, it is clear that unless we are prepared to rule—and we certainly are not—that the sale should be set aside merely because the price was inadequate —which was not known or even suspected until the delayed offers had been made approximately two months later—the order vacating the final order of ratification and setting aside the original sale must be reversed. Other than the delayed offers made after the order *nisi* had been issued and published in which the purchase price was made known to the public generally—which offers were not even renewed at the consequent resale they had engendered—there is nothing in the record to show that the purchase price offered by Standish was inadequate at the time it was accepted by the trustees. Time and time again we have ruled that the interposition of a belated offer after a sale has been made and reported in good faith, indicating a willingness to then pay more than the reported sale price, was not, in and of itself, a valid reason for setting aside a sale. *Gilden v. Harris, supra; Knight v. Nottingham Farms, Inc., supra.* See also *Blank v. Frey,* 165 Md. 647, 170 A. 156 (1934).

A minor point raised by one of the appellees [Lena E. King] suggests that Standish is in court with "unclean hands" because it attempted to by-pass the trustees in the proper exercise of their functions when it presented "without authority" the order for final ratification of the original sale to the court for its signature. The contention is wholly without merit and it will suffice to say that there is no rule of this Court, and we have been referred to no local rule of the Circuit Court for Prince George's County, which restrains any party in interest, including a purchaser, from presenting to the court an order for the final ratification of sale after the order *nisi* has expired. While the practice in the several circuits may vary, it is not an uncommon practice in some of the circuits for a purchaser to secure the ratification of a sale in which he has an interest.

For the reasons assigned, both orders of the chancellor will be reversed.

> *Order vacating final order of ratification and setting aside original sale to Standish Corporation reversed; order finally ratifying resale to Lucore, Inc. reversed; the appellees to pay the costs.*