Bland, Chancellor,
This case standing ready for hearing, and the solicitors of the parties having been heard, the proceedings were read and considered.
.Laying aside such of the allegations of the parties as are neither admitted nor sustained by proof, with the irrelevant testimony, and the case is this: — Amos Ogden, owing to some unhappy circumstances, had separated, and lived apart from his wife, during a period of about thirty years before his death; he had no children; and his wife survived him. At the time of his death he had a considerable estate; consisting of lands lying in Baltimore county, lands in the Big-bcnd of Green river in Kentucky, and some personal property. About ten years before his death, his niece Nancy Ogden, then about seventeen years of age, was brought to live with him. He maintained and educated her; and she managed his household aífairs; in which situation he became so attached to her as to consider her as his adopted child.
Some time in the early part of the year 1817, John W. Ogden, a nephew of Amos', and a cousin of Nancy's, visited and addressed her; a mutual attachment was formed, and they became engaged to be married at a convenient time thereafter. On the *285 first of May, 1817, Amos Ogden bound himself, by a bond, to distribute most of his personal property among Amos Ogden of Stephen, Nancy Ogden, and Sarah Burket. Under these circumstances, on the 22d of May, 1817, he wrote a letter to his brother Benjamin Ogden, the father of John W. Ogden, of which the following extract is all that is material to this case:—
“ Bear Brother—
“ With joy, on the 17th of April last, I received your favour by your son Capt. John W. Ogden, together with my land papers on Phillips, and have to regret, that I have been compelled in giving you so much trouble in the arrangement of my business. But mean to compensate, if giving the largest part of that land will compensate, to your children. I shall deed to your daughter Mary T. Harpenden, and your son Stephen T. Ogden, two hundred acres each, and the remainder to your son John W. Ogden, and his expected spouse Nancy Ogden of our dear brother Stephen, as joint tenants, and to the survivor in fee simple for ever. I have got to inform you, and my loving sister Nancy Ogden, your dear wife, that my dear adopted daughter Nancy Ogden of Stephen, and your son John W. Ogden, is expected to be married some time between this and next spring, as will best suit his return to Maryland. I can tell you, my dear brother, (though my heart bleeds at the idea of her leaving me forlorn of any child to comfort me in my advanced age of life,) I rejoice to think, that she is agoing to be connected to so worthy a man as your son; and I have no doubt but that the Lord will bless them in their affections. She has lived with me nearly ten years, and has conducted herself in such an amiable manner, that both at home and abroad she is beloved. As to the things of this world, I shall bestow on her, at her parting with me, about six thousand dollars worth of real and personal property; and at my death, if blessed by Bivine Providence, at least as much more. You and I do not agree as to the real value of the land in the Big-bend; I should be loth to convey that land to a stranger for less than ten dollars per acre. You will recollect, brother, that there is a great many people in Europe, and as soon as opportunity will admit, will emigrate to America.”
This letter was endorsed in the same handwriting, thus:— “ Copy sent Benj. Ogden.”
Amos Ogden, on the 27th of May, 1817, a few days only after he had written this letter to his brother, made his will, in which, among other things, he says: — “ And whereas it is agreed and *286 expected, that my nephew John Wesley Ogden of Benjamin, and my niece Nancy Ogden of Stephen, will be married to each other some time early this ensuing winter; therefore I give unto them the said John Wesley Ogden and Nancy Ogden, as joint tenants and to the survivor in fee simple, seven hundred acres of land in the State of Kentucky, it being a part of .a tract of land, that I purchased from a certain Philip Phillips, out of his twenty-two thousand one hundred and seventy, on the north side of Green River, and to begin at the upper corner of said survey,” &c. “ I also give to them the said John Wesley Ogden and Jfancy Ogden, as joint tenants and to the survivor in fee simple for ever, part of a tract of land lying and being in Baltimore county, and known by Taylor’s Purchase, it being part of that part of Taylor’s Purchase that I bought of the real estate of William Lux, and was deeded to me by Samuel Moale-, Esqr. as trustee by order of the Honourable Chancellor, and to be strictly included within the following metes and bounds, courses and distances,” &c. “ But it is to be understood, and so my will is, that the said John Wesley Ogden and Nancy Ogden, shall not be entitled to the said part of Taylor’s Purchase, except they shall pay, or cause to be paid, such debts or balances of such debts, and to such persons as I shall charge against her the said Jfancy Ogden, and only charged and credited on the pages of this my will, and that in my own handwriting,” &c. “And whereas I have had many services from Amos Ogden and Nancy Ogden and Sarah Burket, and to secure them in part for such services, I have given to them my bond for the conveyance of all my personal property as hereto annexed, and dated 1817,” &c.
The marriage of John W. Ogden and Nancy Ogden was solemnized on the 25th of December, 1817, and they lived with their uncle until his death, which happened on the 10th of February following, without his having altered or revoked the will he had so made and published. The original letter of the 22d of May was received by Benjamin Ogden, to whom it was directed; and was sent by him to John W. Ogden, but miscarried, and has been lost. The copy now produced was seen in the hands of John W. Ogden as early as the month of August previous to his marriage ; but how he obtained possession of it does not appear; it has been however proved to be an exact copy, and altogether in the handwriting of the late Amos Ogden.
The witnesses speak of the verbal declarations of the late Amos Ogden of his affection for his niece Jfancy ; of his intention to give *287 her a marriage portion; to bestow upon her some of his property, or to provide for her in some way or other; and some of the proofs describe a contract essentially different from that deduced from the letter. But the plaintiffs cannot be allowed to use the letter as evidence of a contract in connexion with a part only of the verbal testimony, rejecting- the rest. The whole must be taken together; and then the verbal proof, instead of sustaining, materially differs from and falsifies the terms of that contract, which it is contended is shewn by the letter.(a)
The bill rests the plaintiff’s pretensions upon the ground, that the late Amos Ogden induced John W. Ogden to marry Jfancy by a promise, that he would give Ijer twelve thousand dollars as a marriage portion; and refers to the letter of the 22d of May, and certain other circumstances, as evidence of that promise. The defendant Amos Ogden admits, that the copy exhibited is in the handwriting of the late Amos Ogden ; but all the defendants positively deny having any knowledge whatever of any such promise or inducement to the marriage as is charged in the bill. None of the defendants have, in their answers, relied upon the statute of frauds; but it has been mainly insisted upon by them, in argument, at the hearing.
The statute of frauds, so far as it is applicable to this case, is expressed in these words : — “ No action shall be brought whereby to charge any person, upon any agreement made upon consideration of marriage, unless the agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.”(b)
This clause was at one time supposed to embrace mutual promises to marry, but that notion has long since been abandoned, and it is now held to extend only to agreements to pay marriage portions, or to such cases as the one now under consideration.(c) The word “ agreement,” it has been settled, must not be loosely construed, but be taken in its proper and correct sense, as signifying a mutual contract on consideration between two or more parties; the whole of which, the consideration as well as the promise, must be in writing.(d)
*288 In cases of this kind the defendant may be compelled to answer fully to all the material allegations of the bill, whether he insists upon the benefit of the statute of frauds or not. But, if the statute is relied on, there can be no decree for the plaintiff, although the parol agreement should be admitted by the answer; and, consequently, to obtain relief, in such case, the plaintiff must either prove an agreement completely in writing, or such a part performance of the parol agreement admitted by the answer, as will take the case out of the statute. But if the defendant does not say any thing about the statute, then he must be taken to have renounced the benefit of it. (e)
The sole question is, then, whether the late Amos Ogden did sign an agreement in writing in consideration of this, marriage, binding himself to give his niece Nancy, a marriage portion of twelve thousand dollars as is alleged; or whether there has been such a part performance as should induce the court to enforce a compliance with any parol agreement to that effect.
Marriage alone is not considered as a part performance of a contract of this nature;(f) yet if a person writes a letter promising to give a fortune with his daughter or niece to a man if he should marry her; and, under the encouragement of the letter, the man does marry her, he shall recover; the agreement having been executed, as far as it could be, on his part.(g) And such a letter addressed to the father, or a friend of the man, on his behalf, will be as obligatory as if addressed to the man himself. (h) But here, as no parol agreement has been admitted or proved, it will be unnecessary to say what should be deemed a binding partial performance of a contract in consideration of marriage.
The whole of this case rests upon the letter of the 22d of May, 1817. If that cannot be considered as an agreement within the meaning of the statute of frauds, there is an end of the case. The cases in which letters have been considered as constituting such an agreement, have gone fully as far, perhaps farther, than a just construction of that statute will warrant. They all, however, go upon the principle, that the court must be satisfied by a fair interpretation of the letters, that they import a concluded agreement ; or afford sufficient materials for a more formal agreement. *289 But if it be reasonably doubtful, whether what passed was only a treaty, let the progress towards the confines of an agreement be more or less, or if it be doubtful, whether the language used was intended as expressive of an agreement, the court will not decree the specific performance of that which appears doubtful as a contract, (i)
But this letter is deficient in almost every substantial particular. It is not a promise in any sense. The writer speaks of circumstances which have occurred; of a marriage then contemplated; of what he intended to do; and of the manner in which he meant to dispose Of his property. But there is not the least intimation that he had brought about the courtship, or had encouraged John W. Ogden to marry his niece by any promise of a fortune with her. He does not undertake,- agree, or oblige himself to give any thing. He tells his brother what he means to do, should the marriage take place; but he binds himself to nothing; every thing is reserved entirely within his own power, (j) The plaintiffs had resolved to marry before this letter was written; therefore, even supposing it had. been shewn to John W. Ogden, it could not have been the inducement upon which he addressed and became engaged to marry JVancy Ogden. Whatever were his hopes and expectations, they existed prior to, and independently of this letter; they could not have arisen in any respect from it. (k) There is no proof, that the late Amos Ogden had induced the plaintiffs to entertain any hopes or expectations of his bestowing any thing upon them in consideration of their marriage. After they had become engaged, he then expressed his entire approbation, and he then formed his liberal determination; but there is no proof that he himself communicated it to them prior to their engagement. And in his letter to his brother, there is nothing which gives to that determination the character of a contract.
Being perfectly satisfied upon these grounds, that the plaintiffs have not established such a case as to entitle them to any relief whatever, I deem it wholly unnecessary to say any thing in relation to the doctrine of satisfaction and election; or how far the devise to John W. Ogden and his wife, and their having actually elected to take under the will, is to be considered as a satisfaction and election in bar of their claim; since it is my opinion *290 that the testator had not bound himself to them by any contract whatever.
Whereupon it is decreed, that the bill of complaint be, and the same is hereby dismissed with costs, to be taxed by the register.

 Cooper v. Smith, 15 East, 103.

 29 Car. 2, c. 3, s. 4.

 Harrison v. Cage, 1 Ld. Raym. 387.

 Wain v. Warlters, 5 East, 10; Stadt v. Lill, 9 East, 348; Randall v. Morgan, 12 Ves. 74.

 Whitchurch v. Bevis, 2 Bro. C. C. 567; Cooth v. Jackson, 6 Ves. 37; Blagden v. Bradbear, 12 Ves. 471; Rowe v. Teed, 15 Ves. 375.

 Taylor v. Beech, 1 Ves. 297.

 Seagood v. Meale, Prec. Cha. 560.

 Moore v. Hart, 1 Vern. 201; Welford v. Beezely, 1 Ves. 6; S .C. 3 Atk. 503.

 Huddleston v. Briscoe, 11 Ves. 583; Stratford v. Bosworth, 2 Ves. & B. 341; Allen v. Bennet, 3 Taunt. 173.

 Randall v. Morgan, 12 Ves. 67; Morison v Turnour, 18 Ves. 175.

 Ayliffe v. Tracy, 2 P. Will. 65.