PELLEGRINO ET AL. *v.* MARYLAND
NATIONAL BANK ET AL.

[No. 359, September Term, 1971.]

*Decided June 7, 1972.*

*Motion for rehearing filed June 27, 1972; denied June 29, 1972.*

The cause was argued before HAMMOND, C. J., ▮ and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ., and RICHARD P. GILBERT, Associate Judge of the Court of Special Appeals, specially assigned.

*Francis D. Murnaghan, Jr.,* for appellants Anne Smith Pellegrino, Banks Lund Smith and Kathleen Ingrid Smith, with whom were *Shale D. Stiller* and *Avery Aisenstark* on the brief for appellant Mary J. Smith.

*Edward S. Digges,* with whom were *Richard J. Clark* on the brief for appellee Robert J. Smith, Jr., and *John O. Herrmann* on the brief for appellee Maryland National Bank, Executor and Trustee under the will of Banks Lamar Smith, deceased.

SINGLEY, J., delivered the opinion of the Court.

The appellants in this case are the widow and the three children of a prior marriage of Banks Lamar Smith (Mr. Smith), who died on 8 April 1969, domiciled in Charles County, Maryland. The appellees are Maryland National Bank (Maryland National), the executor of Mr. Smith's will, and the trustee of two trust estates created by the will, and Robert J. Smith, Jr., a brother of Mr. Smith. The question presented is whether Robert J. Smith, Jr., validly exercised a purchase option accorded him by Mr. Smith's will. From a decree entered by the Circuit Court for Charles County, declaring that there had been a valid exercise of the option, and allowing a period of 90 days for settlement, Mr. Smith's widow and children have appealed.

On 9 April 1965, when Mr. Smith executed his will, he owned all of the capital stock of Smitty's Steak House,

Inc., and Smitty's Management Company, Inc. (Smitty's Management). After the execution of the will and a 1966 codicil, and prior to his death, Mr. Smith had entered into a buy and sell contract with Robert J. Smith, Jr., covering all of the stock in Smitty's Steak House, Inc., which in substance became effective in the event of Mr. Smith's death. It is only the stock in Smitty's Management which is here involved.

Paragraph XIV of Mr. Smith's will provided:

"I am the sole stockholder and owner of Smitty's Steak House, Inc. [and] Smitty's Management Company, Inc., both Maryland corporations to which I have devoted substantial efforts. It is my desire that after my death my brother, ROBERT J. SMITH, JR., be given the first opportunity to purchase the capital stock of these corporations. To the accomplishment of this end I direct that upon my death my Executor and Trustee offer to my said brother the right to purchase, within one year of my death all the issued and outstanding capital stock of either or both of the aforementioned corporations that I may own at the time of my death (but in no event less than all of said shares), at the book value of said shares at the date of my death. I further direct that my Executor or Trustee be liberal in the granting of credit and otherwise fixing the terms of sale to my said brother without being liable for any loss resulting therefrom except for its own negligence."

Robert J. Smith, Jr., learned of the provisions of Mr. Smith's will within three weeks of Mr. Smith's death, and discussed the purchase option with representatives of Maryland National on 20 June 1969. Thereafter, there were conversations between Smith and Joseph A. Waldman, Esq., who represented Maryland National, in which Smith steadfastly maintained that he had no intention of exercising his purchase option. Finally, Mr. Waldman

advised Maryland National that it might be desirable to have a written confirmation of Robert J. Smith, Jr.'s determination not to exercise his option.

Accordingly, Mr. Waldman drafted a letter which was sent by Maryland National to Robert J. Smith, Jr., on 2 February 1970, which said, in part:

> "It is our understanding that this aforementioned right granted to you to purchase the shares of Smitty's Management Company, Inc. does not extend beyond April 8, 1970, one year after your brother's death. We accordingly request that you promptly notify us, in writing, whether or not you intend to exercise your right to purchase the said shares of capital stock of Smitty's Management Company, Inc.

> "If you do elect to exercise your right to purchase the shares of stock of Smitty's Management Company, Inc., we urge that steps be immediately taken to negotiate the terms and conditions of the purchase agreement and to establish a time and place for settlement of the purchase. We shall be glad to meet with you and your counsel at your earliest convenience to complete the necessary arrangements. As per your telephone conversation of January 30, 1970 with Joseph A. Waldman, Esquire, we are sending a copy of this correspondence to Edward S. Digges, Esq., Route 1, LaPlata, Maryland, who we understand is your attorney.

> "If we can be of any service to you, please do not hesitate to call upon us."

Sometime between February and April, 1970, Robert J. Smith, Jr., learned from Isadore Wolfe, who had been Mr. Smith's accountant, and had continued to act for Smitty's Management, that the book value of the company's stock as of 8 April 1969, the date of the death of Mr. Smith, had been determined to be $251,841.31. Wolfe had earlier advised Maryland National of this determina-

tion. As at the date of Mr. Smith's death, the market value of the company's stock was thought to have been $341,-310.71.

On 6 April 1970, Maryland National received a letter dated 2 April 1970 from Edward S. Digges, Esq., who by that time was representing Robert J. Smith, Jr. This letter said, in part:

"Despite the statement in your letter [of 2 February 1970] contained in the second paragraph on page 2, the wording of the decedent's Will is clearly mandatory that you must offer to Robert J. Smith, Jr. the stock at its book value, which you have the responsibility of determining as well as fixing the terms of the sale. This information has not been received by Mr. Smith at any time and, accordingly, demand is made for receipt of this information immediately. Should you fail to comply with this direction, my client intends to hold you responsible for negligence and any damages he may suffer as a result of his being unable to make an election within the one (1) year period as provided in Item XIV of the Will."

Maryland National replied on the same day, in a letter which was hand delivered on 7 April:

"Your letter of April 2, 1970 sent certified mail and addressed to John F. Fox, Trust Officer, was received on behalf of the addressee on April 6, 1970. In view of the addressee's absence on vacation, your letter was turned over to me for response.

"Regrettably, we must inform you that the Maryland National, as Executor, must take exception to the position taken by you for the reasons set forth below:

"1. Your letter assumes an inability on your client's part to make a decision because the in-

ventories in the court proceedings had not been filed and because 'you (the Executor) have the responsibility of determining (the book value of the stock).'

"A. There is nothing in the Will which requires the Executor or Trustee to determine the book value of the stock. Furthermore, the Executor or Trustee would not have been required to determine the book value of the stock of Smitty's Management Company, Inc. in order to file an inventory, which, as you know, is based on fair market value.

"B. Your letter states that you have reviewed the matter with Mr. Wolfe. As you know, Mr. Wolfe is, and has been for many years, the accountant for Smitty's Management Company, Inc. As such, he has complete access to all its books and records, including all information with respect to the book value of the stock on April 8, 1969. Mr. Wolfe also knows the location of all the assets of 'Management.' As Mr. Smith is aware, there was nothing to prevent him from obtaining appraisals of the fair market value of the underlying assets of the Corporation.

"2. Your letter states that 'you (the Executor or Trustee) must offer to Robert J. Smith, Jr. the stock at its book value.' This, the Executor has done. The Executor's letter of February 2, 1970 expressly offered to Mr. Smith the right to buy all the stock. We fail to understand, therefore, how you can imply that the Executor has not made an offer of the stock.

"Although your letter does not mention the condition relating to Mrs. Smith's right to renounce and obtain one-third ($\frac{1}{3}$) of the stock referred to in the Executor's letter, it should be clearly understood that the mention of this right in Mrs. Smith in no way impeded, or detracted

from, the Executor's obligations to make its offer. The Executor was required to notify your client of Mrs. Smith's possible claim; to have failed to so notify your client would, in our opinion, have been misleading to your client.

"3. The most distressing aspect of your letter is, of course, its timing. Your client's failure to communicate with us as to his interest in the capital stock of Smitty's Management Company, Inc. until two (2) days before the expiration of the one (1) year period is inexcusable, particularly in view of the fact that it is our understanding that your client had, on several occasions, verbally assured Joseph A. Waldman, Esq., counsel to the Executor, that he (Robert J. Smith, Jr.) had no interest in exercising the right to purchase 'Management's' stock. Mr. Robert J. Smith was given a copy of his late brother's Will shortly after the decedent died. Mr. Robert J. Smith is, and has been, aware for at least nine (9) months of the extreme complexity and involvements of the decedent's Estate. Incidentally, we have learned that a copy of your letter of April 2, 1970 was received by counsel sometime on April 3, 1970.

"Over two (2) months ago, the Executor wrote Robert J. Smith (sending you a copy), setting forth the relevant provisions of the Will and offering him the right to buy the stock of 'Management.' In that letter, recognizing the complications that might ensue in arriving at mutually agreeable credit terms, even within the liberal standards set forth in the Will, the Executor requested that Robert J. Smith 'promptly notify us, in writing, whether or not you (Robert J. Smith), intend to exercise your right to purchase the said shares of capital stock of Smitty's Management Company, Inc.' From February 2, 1970 until April 6, 1970, no written communica-

tion was forthcoming from your client or from you. Only on or about April 1, 1970 did anyone even receive a telephone call from your client or you.

"In the Executor's letter of February 2, 1970, the Executor also went so far as to 'urge that steps be *immediately* taken to negotiate the terms and conditions of the purchase agreement and to establish a time and place for settlement of the purchase.' The Executor fails to understand why, in view of the generous accommodating approach taken by the Executor, its letter was ignored until two (2) days before the due date for the expiration of the offer. The Executor even added: 'We shall be glad to meet with you and your counsel at your earliest convenience to complete the necessary arrangements.' (Emphasis in original.)

"The Executor, as you know, is not only acting as Executor, but as Trustee under certain Trusts, one for a wife who has already expressed some hostility to the Will and the other for minor children. If there be any value to the capital stock of Smitty's Management Company, Inc. in excess of its book value, the Executor might be breaching its duty to the beneficiaries of these Trusts were it to ignore the fact that your client has seemingly disregarded the reasonable approach of the Executor, as evidenced by the letter of February 2, 1970. Surely you, as an attorney, will appreciate the fact that the Executor owes a duty to your client and to the beneficiaries of the Trust. The Executor could not ignore its obligation to offer the stock to your client; but similarly, the Executor cannot ignore its obligations to the Trust beneficiaries by dismissing as irrelevant your client's delay, until the last minute, in responding to its letter of February 2, 1970.

"The Executor feels that it has acted both properly and reasonably in discharging its duties to your client.

"Your letter of April 2, 1970 demands receipt of information with respect to the book value of the stock as of the decedent's death, as well as the terms of the sale. All of the information with respect to the book value is in Mr. Wolfe's hands, and your client is fully able to determine the said book value; and he has been in this position for many months.

"Subject to the court's ratification and approval of the sale, including the dates, terms and conditions of the proposed Contract of Sale, the Executor will agree to sell the stock of Smitty's Management Company, Inc. to your client on the following terms and conditions:

"(a) Purchase price—book value per share as of April 8, 1969.

"(b) Ten (10%) per cent in cash upon your client's acceptance of the offer (within limitations of time in which the. Executor is authorized to act with respect to said offer).

"(c) Forty (40%) per cent of the purchase price in cash at settlement, which settlement is to be held within thirty (30) days of the court's final approval of the sale, if such approval is obtained.

"(d) Balance of the purchase price to be paid within ten (10) years of the date of settlement. The balance of the purchase price to be secured by a pledge of the Corporation's capital stock, plus a mortgage on the Corporation's real estate. The mortgage to bear interest on the unpaid balance at the rate of eight (8%) per cent per annum; its unpaid balance to be amortized in ten (10) equal annual installments, the first of which is to be due and payable one (1) year from the date of settlement.

"Frankly, we do not see how this offer can be approved by the Orphans' Court of Charles County by April 8, 1970. As Trustee for the beneficiaries, we must give the beneficiaries the right to approve or object to the terms and conditions of the proposed offer and to participate in a hearing before the Orphans' Court. Had your client communicated with us within a reasonable period of time of receiving our letter of February 2, 1970, and not waited to contact us with less than two (2) days to go, there might have been an opportunity to obtain all of the necessary approvals before April 8, 1970. Your client's delay has so seriously prejudiced his position that, in our personal opinion, he may have jeopardized some of his rights."

On the late afternoon of 8 April, the anniversary of Mr. Smith's death, Mr. Digges, representing Robert J. Smith, Jr., went to the Baltimore office of John O. Herrmann, Esq., who was then representing Maryland National, and proposed that his client purchase the stock at the book value of $251,841.31, 10% down, the 90% balance to be payable over a period of 20 years, in equal annual installments, with interest at 7%. This proposal was rejected by Maryland National, and after some further discussion, Mr. Digges countered with a new proposal:

"Re—Will of the late Banks Lamar Smith (#1113)

"Gentlemen:

"On behalf of my client Robert J. Smith, Jr. this is to advise that he elects to purchase all the issued and outstanding capital stock in Smitty's Management Company, Inc. a Maryland corporation as provided in Item XIV of the will of Banks Lamar Smith at the book value of $251,-841.31 which is as agreed to be the price on

April 8, 1969 the date of the death of the late Mr. Smith.

"The terms shall be the following:

"1.—10% Cash payment upon delivery of the stock which shall be pledged as security as hereinafter provided.

"2.—$2500.00 cash deposited with your Bank to be considered a part of the total 10% Cash payment.

"3.—90% of the remaining purchase price shall be secured by a pledge of the Corporation's capital stock plus a mortgage on the Corporation's real estate. The terms of the mortgage shall be payable in ten (10) annual payments with the first payment due one year after settlement with interest at (8%) eight per cent per annum payable semi-annually. Right of prepayment reserved to mortgagor.

"These mortgage terms are as agreed upon at the writing of this letter with a detailed contract to be executed by the parties.

"This sale of the stock to Robert J. Smith, Jr. under the will and under the terms outlined shall be subject to ratification of the appropriate court."

This offer was accepted by Maryland National by an endorsement which read: "Robert Smith's offer to purchase is accepted subject to Court approval * * * 7:45 P.M. 4/8/70."

It was at this juncture that the exercise of the option was challenged by Mr. Smith's widow and his children in an action which sought to have the exercise of the option declared invalid because it did not conform to the pro-

visions of Mr. Smith's will. They advance a two-pronged argument: first, that the will required a completed purchase by the anniversary of the decedent's death, and not merely an executory contract to purchase at some future unspecified date; and second, that the agreement of 8 April 1970 was not a valid exercise of the right to purchase.

Facially, at least, the appellants' first contention seems persuasive. Certainly, it was scarcely Mr. Smith's intention that the purchase option was to be exercised at 7:45 p.m. on the anniversary of his death. There are compelling practical reasons which would support the conclusion that he contemplated that the option, if it were to be exercised at all, would be exercised in a fashion which would have permitted the purchase and sale to have been concluded before the expiration of the one-year period, but this cannot be derived from the language of the will itself, "* * * I direct that * * * my Executor and Trustee offer to my said brother the right to purchase, within one year of my death * * *."

The simple fact is, however, that Maryland National, as executor, although it might have been well within its rights in rejecting an eleventh hour offer, chose instead to accept the offer, subject to court (presumably orphans' court) approval. Whether it should or should not have done so is not the critical issue: rather, the point is that it was empowered to do what it did by the terms of Mr. Smith's will.

The principal thrust of the appellants' argument is that an option, if it is to mature into a bilateral contract, must be exercised unconditionally and in accordance with its terms, relying primarily on *Foard v. Snider*, 205 Md. 435, 446, 109 A. 2d 101 (1954). More recently we restated the rule in *Katz v. Pratt Street Realty*, 257 Md. 103, 118, 262 A. 2d 540 (1970). Had this case reached us on a bill for specific performance brought by Robert J. Smith, Jr. to enforce his exercise of the option, the line of authority represented by *Foard* and *Katz* would have been completely applicable, and might well have spelled defeat for Smith.

The case is before us in a vastly different posture, however. Maryland National chose to regard the offer as a valid exercise of the option, and formally accepted it, subject only to court approval. This was clearly within the scope of its power as executor, as will be developed in our consideration of the appellants' next contention.

The appellants' second argument is that the offer of 8 April was too imprecise in spelling out details to constitute a valid exercise of the option. It specified no date by which the sale was to be consummated, but this was corrected by the lower court's order, and in any event a reasonable time might have been implied under the reasoning of *Hilgartner v. Hilgartner,* 127 Md. 270, 96 A. 519 (1915). The offer was so structured as to permit a contention that only 90% of the remaining purchase price, rather than that portion of the purchase price which was deferred, amounting to 90% of the consideration, was to be secured by a mortgage on the real estate and a pledge of the stock. At argument, counsel for Robert J. Smith, Jr. conceded below and before us that the latter alternative was intended. The amounts by which and the dates on which prepayment could be made were not specified, which would indicate only that prepayment could be made in whole or in part at any time. There is some question whether the amount agreed upon was a precise statement of book value. Finally, the appellants say that Maryland National never sought the court approval which was a condition of both the offer and the acceptance.

The answer to these arguments is a simple one. The proposal by its terms contemplated that a more detailed contract would be prepared, permitting an elaboration of these provisions, if in fact elaboration were necessary. According to Maryland National, the failure to seek court approval was occasioned by the fact that the declaratory action was brought less than three weeks later.

The whole matter was further clouded by the widow's right to renounce the provisions of the will and take instead her statutory share. Mr. Smith died in April of

1969, with the consequence that the administration of his estate was not controlled by Ch. 3, § 1 of the Laws of 1969, which substantially revised Maryland Code, Article 93, relating to the administration of the estates of decedents who died on and after 1 January 1970. Under the law applicable to Mr. Smith's estate, Code (1957, 1964 Repl. Vol.) Art. 93, § 329, his widow could, at any time within a period of seven months of the grant of letters, elect to renounce the provision made for her by his will, and elect to take instead her statutory share, which in this case would have been one-third of each of his assets in kind, including the stock of Smitty's Management, *Hall v. Elliott,* 236 Md. 196, 202 A. 2d 726 (1964). *But see* Code (1957, 1969 Repl. Vol.) Art. 93, § 3-208.

Code, Art. 93, § 330 permitted the orphans' court to extend the period within which this election could be exercised for a period "not exceeding six months upon any one application." Mrs. Smith had obtained extensions of the period during which she could exercise her right to take against the will to dates later than 8 April 1970 and, according to counsel, has entered an appeal from the denial of an extension beyond 21 August 1971.[1] It will be remembered that Mr. Smith's will accorded Robert J. Smith, Jr. the right to purchase "* * * all the issued and outstanding capital stock of * * * the aforementioned corporations that I may own at the time of my death (but in no event less than all of said shares) * * *."

As a result, if Mrs. Smith can still validly elect to take against the will, Robert J. Smith, Jr.'s attempted exercise of the option may yet be frustrated. The appellants make a point of the fact that Robert J. Smith's offer made no reference to the likelihood of a renunciation. Since this was a possibility known to him and to the executor, it can scarcely be regarded as an omission of any consequence.

---

1. On 18 November 1969, the orphans' court extended the time within which Mrs. Smith could make her election to 22 April 1970; on 7 April 1970, to 22 August 1970; on 21 July 1970, to 21 August 1971, and on 17 August 1971, denied any further extension.

We have had occasion several times in the recent past to consider the nature and extent of a fiduciary's powers when assets which he holds for the benefit of others are sold, *Knight v. Nottingham Farms, Inc.*, 207 Md. 65, 113 A. 2d 382 (1955); *Webb & Knapp v. Hanover Bank*, 214 Md. 230, 133 A. 2d 450 (1957), and *Feldman v. Feldman*, 234 Md. 173, 198 A. 2d 257 (1964), which followed the teaching of *Gould v. Chappell*, 42 Md. 466, 470 (1875):

> "The discretion thus reposed in the trustees was not *a mere arbitrary discretion,* but a discretion *coupled with a trust,* and to be exercised solely for the benefit of *the cestuis que trust.* It was their duty, therefore, in making a sale of the property to act in a *prudent and business-like manner,* with a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances. In other words, to exercise that diligence and caution which a careful and prudent owner would observe in the sale of his own property. If the sale be made under circumstances of haste and imprudence, or if the trustees fail in reasonable diligence in inviting competition, or adopt an injudicious and disadvantageous mode of selling the property, a Court of Equity ought not ratify the sale." (Emphasis in original)

Although these cases involved sales of real estate, essentially the same principle is invoked when sales of personalty are made by an executor or administrator, *Goldsborough v. DeWitt*, 171 Md. 225, 258-259, 189 A. 226 (1937); *Park & Tilford Import Co. v. Nash,* 166 Md. 373, 385, 171 A. 339 (1934), which would seem to import a standard of good faith and that degree of care which a reasonable and prudent person would exercise in the conduct of his own affairs.

If we apply these principles to the facts at hand, a clear picture emerges. There is no intimation that Mary-

land National exhibited a lack of prudence or diligence. It regarded itself bound by Mr. Smith's expressed intention that Robert J. Smith, Jr. be accorded a first opportunity to purchase the stock at book value and his injunction that the executor was to "be liberal in the granting of credit and otherwise fixing the terms of sale," and for nearly a year, it had urged him to take a position, one way or the other. There is no complaint that the price was inadequate nor could there be, because the mechanism for determining the price was set up by the will. It was the lethargy of the purchaser and not a lack of diligence on the part of the executor which brought about the exercise of the option on the very last day. Maryland National endeavored to perform its duties under conditions which could not have been less than exasperating, and did what a reasonable and prudent person, acting under a comparable directive, would have done in the circumstances.

On a motion to revise the decree, which was denied by an order of 15 October 1971, the appellants made much of the fact that Mrs. Pellegrino, Mr. Smith's daughter, visited Mr. Digges in his office shortly after her father's death and asked that he represent her and her brother and sister in any matter affecting their father's estate. No such services were required, other than asking Mr. Digges to obtain a copy of Mr. Smith's will for which he made no charge. Whether Mr. Digges did or did not act with propriety is not an issue in the case—and even if we assumed that he did not, an assumption which is difficult to make, since his representation of Robert J. Smith, Jr. commenced nearly a year after his last contact with Mrs. Pellegrino, an impropriety in which Smith was in no way involved should not be permitted to prejudice whatever rights he had.

*Decree and order affirmed, costs to be paid by appellants.*